UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ROBERT COUTURE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:15-cv-529-NT |
| | ) |
| AMERIGAS PROPANE, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

Before me is the Defendant's motion to dismiss the Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted (ECF No. 16). For the reasons that follow, the Defendant's motion is **DENIED**.

**BACKGROUND**

The Plaintiff is Robert Couture. Couture began working for Defendant AmeriGas Propane, Inc. in November, 1998. Am. Compl. ¶ 5 (ECF No. 15). On Thursday, October 23, 2014, AmeriGas Operations Manager for the Lewiston District Fred Clavet asked Couture to respond to a suspected gas leak at the Biddeford Olive Garden. Am. Compl. ¶ 7. Couture told Clavet that he was not certified to work on commercial gas equipment, and so he was "not qualified to do anything at this location if there was an issue."[1] Am. Compl. ¶ 8. In the course of that conversation,

---

[1] The Amended Complaint uses "certified," "licensed," and "qualified" interchangeably. Because Couture uses "certified" most often, I will use that term throughout.

however, Clavet prevailed on Couture to go to the Olive Garden, and Couture agreed to "turn off the gas to secure the area." *See* Am. Compl. ¶ 8.

After speaking with Clavet, Couture called Russell Bryant, a technician with certification to work on commercial gas equipment. Am. Compl. ¶ 9. Couture arrived at the Olive Garden thirty minutes before Bryant and turned off the gas supply. Am. Compl. ¶ 10. Once Bryant arrived, he and Couture walked around the restaurant and smelled gas in two areas. Am. Compl. ¶ 11. Bryant fixed the problem in the first area, but could not fix the problem in the second "because it was too corroded." Am. Compl. ¶ 11. Bryant later told AmeriGas that he "released Couture from this call out (as he is a driver . . .)[,]" performed "a check of every 'appliance' in the building as well as the gas piping," and found "everything in order." Am. Compl. ¶ 22.

The following Friday and Saturday, the Olive Garden called AmeriGas twice more to complain that the gas leak had not been resolved. Am. Compl. ¶ 12. On Monday, October 27th, the AmeriGas district manager called a meeting with Couture and Bryant. Am. Compl. ¶ 13. The manager asked Couture why he had not performed a "pressure test" at the Olive Garden, "as it was policy to do so whenever a client complained of a leak." Am. Compl. ¶ 13. Couture responded that he had not performed the pressure test because he was "not certified to work on commercial equipment and that it would have been illegal for him to do so." Am. Compl. ¶ 13. The manager suspended both Couture and Bryant, pending an investigation. Am. Compl. ¶ 15.

Later that day, Couture called the AmeriGas ethics hotline to complain that he had been wrongfully suspended. Am. Compl. ¶ 15. The following day, AmeriGas

2

terminated Couture and Bryant. Am. Compl. ¶ 16. Couture believes he was wrongfully terminated for his refusal to perform the test despite his lack of certification. Am. Compl. ¶ 17.

On October 28th, the day Couture was terminated, he wrote an email to Warren Patterson in AmeriGas "upper management," describing the recent events and complaining that he had been "unlawfully" and "wrongfully" terminated. Am. Compl. ¶ 19. On October 29th, Couture also wrote an email to Kevin Rumbelow in AmeriGas "upper management" with the same information and complaint. Am. Compl. ¶ 20. On November 16th, the AmeriGas area manager reinstated Couture. Am. Compl. ¶ 23. Couture observed that the area manager "was clearly forced" to rehire Couture because upper management determined that the area manager "had made a bad judgment call for firing [Couture] for something [he] was not responsible to handle." Am. Compl. ¶ 23.

Two months later, on January 22, 2015, AmeriGas terminated Couture again. Am. Compl. ¶ 24-25. Earlier that day, Couture was sitting in his stopped truck when an AmeriGas employee named Sullivan unexpectedly approached the vehicle to "check up on him." Am. Compl. ¶ 24. Sullivan noticed that Couture had covered the truck's driving camera with a napkin. Am. Compl. ¶ 24. Couture explained that he had done so because he wanted privacy while taking a "coffee break." Am. Compl. ¶ 24. Approximately thirty minutes later, an AmeriGas employee named Dennis called Couture to the office and terminated him. Am. Compl. ¶ 25. Couture asserts

that other employees' driving cameras "go off numerous times while in motion," but they have never been "written up." Am. Compl. ¶ 26.

Couture believes that this termination was retaliation for his refusal to perform the pressure check and for his complaints to upper management. Am. Compl. ¶ 27. He received a right to sue letter from the Maine Human Rights Commission. Am. Compl. ¶ 28.

## LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion, the complaint need not demonstrate that the plaintiff is likely to prevail, nor even "plead facts sufficient to establish a prima facie case." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013). The complaint only must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The First Circuit follows a two-step plausibility inquiry:

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). This is "a 'context-specific' job" that requires the Court to " 'draw on' [its] 'judicial experience and common sense.' " *Id.* (quoting *Iqbal*, 556 U.S. at 663-64).

## DISCUSSION

Couture brings a one count claim of retaliation under the Maine Whistleblower Protection Act ("**MWPA**"). 26 M.R.S.A. § 831. He alleges that AmeriGas terminated his employment in response to both his refusal to perform a pressure test without certification and his complaints to corporate management. AmeriGas argues in response that Couture's Amended Complaint fails to establish a prima facie claim for a violation of the MWPA.

The Maine Human Rights Act ("**MHRA**"), 5 M.R.S.A. § 4572(1)(A), provides a private right of action to individuals who have been subject to unlawful discrimination, including a violation of the MWPA. *See Harrison v. Granite Bay Care, Inc.* 811 F.3d 36, 46 (1st Cir. 2016). To establish an MWPA prima facie claim, an employee must prove that "(1) she engaged in activity protected by the statute; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Id.* (citing *Costain v. Sunbury Primary Care, P.A.*, 954 A.2d 1051, 1053 (Me. 2008)). "[T]he employee's burden of proving a prima facie case of retaliation is relatively light, and requires only a small showing that is not onerous and is easily made." *Brady v. Cumberland Cty.*, 126 A.3d 1145, 1151 (Me. 2015) (citations omitted); *see also Bodman v. Me., Dep't of Health and Human Servs.*, 720 F. Supp. 2d 115, 124 (D. Me. 2010) ("[e]stablishing such a prima facie case is not a demanding task.").

AmeriGas argues that Couture failed to plausibly allege either that he engaged in conduct protected by the MWPA or that there was a causal connection between any purported protected conduct and his termination from employment. Def.'s Mot.

5

to Dismiss 1-2 (ECF No. 16). The following discussion considers these two arguments in turn, accepting as true all well-pled facts and drawing all reasonable inferences in the Plaintiff's favor. *Martínez-Rivera v. Commonwealth of P.R.*, 812 F.3d 69, 73 (1st Cir. 2016).

## I. Protected Activity under the MWPA

The Defendant argues that Couture's alleged conduct does not fall under either 26 M.R.S.A. § 833(1)(D) ("**Section D**"), which protects an employee's good faith refusal to comply with an illegal or dangerous directive, or § 833(1)(A) ("**Section A**"), which protects an employee's good faith report of the employer's illegal activity. Def.'s Mot. to Dismiss 6, 8.

### A. Good Faith Refusal to Comply with an Illegal or Dangerous Directive

Section D provides that an employer may not discharge an employee where:

> The employee acting in good faith has refused to carry out a directive to engage in activity that would be a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States or that would expose the employee or any individual to a condition that would result in serious injury or death, after having sought and been unable to obtain a correction of the illegal activity or dangerous condition from the employer.

26 M.R.S.A. § 833(1)(D).

Couture alleges that he was directed to perform a pressure test despite his lack of certification to operate commercial gas equipment. Generally, the AmeriGas company policy required all personnel to perform a pressure test in response to a gas leak. Am. Compl. ¶ 13. Specifically, Couture's manager asked Couture to respond to the gas leak after Couture objected that he lacked the certification to work on

6

commercial equipment. Am. Compl. ¶ 8. After the repair visit, Couture's manager asked why he had not followed policy and performed the pressure test and terminated him. Am. Compl. ¶¶ 13, 15, 16.

AmeriGas argues that Couture failed to establish protected conduct under Section D because there was no directive for Couture to act contrary to the law. AmeriGas asserts that the policy to test for leaks when a customer complains of a leak should not be considered a directive in this case. Def.'s Mot. to Dismiss 7. At best, AmeriGas argues, Couture's manager directed Couture to "respond" to the gas leak, which Couture could do lawfully by turning off the gas and bringing along the certified technician. Def.'s Reply 3 (ECF No. 20). In addition, the manager's question about why Couture had not performed the test was not a directive because it was after the fact. Def.'s Mot. to Dismiss 7. I find that the combination of the policy, the direction to "respond," and the subsequent disciplinary action from Couture's manager plausibly suggests that there was a directive to address the gas leak without regard for the certification rules or public safety.

AmeriGas argues in the alternative that even if there were a directive, Couture failed to allege that he unsuccessfully sought a correction of the illegal activity from the employer, a necessary element of a Section D claim. Def.'s Mot. to Dismiss 8. Rather, Couture was able to correct the purported illegal directive because he could bring Bryant. Def.'s Mot. to Dismiss 8. Therefore, AmeriGas reasons, there was "no need" for Couture to work on the system. Def.'s Reply 4.

This argument is unavailing. The Amended Complaint alleges that Couture told his manager that he lacked the necessary certification "to do anything." Am. Compl. ¶ 8. This fact could plausibly lead a factfinder to determine that Couture tried to correct the illegal activity or dangerous condition. In addition, AmeriGas does not account for the thirty minutes that Couture spent at the Olive Garden before Bryant arrived, at his manager's request, and contradictorily asserts that "Plaintiff failed to ensure that a safety hazard was addressed, for which he was terminated." Def.'s Reply 4. If Couture turned off the gas and was terminated for failure to address the safety hazard, it is plausible that AmeriGas expected him to do more. Accordingly, at this stage, Couture's decision not to perform a pressure test could plausibly constitute protected conduct under Section D.

### B.  Good Faith Report of Illegal Activity

Because I find that the pleadings plausibly show protected conduct under Section D, I need not reach AmeriGas' argument that the pleadings fail to show protected conduct under Section A.

## II.  Causation

AmeriGas also raises the issue of whether Couture sufficiently plead causation, the third prong of the prima facie case. In general, temporal proximity alone may provide the causal link for an MWPA claim. *Cormier v. Genesis Healthcare LLC,* 129 A.3d 944, 951-52 (Me. 2015); *Brady*, 126 A.3d at 1153. There is no exact rule on what length of time is sufficient for this purpose. *Compare Fuhrmann v. Staples the Office Superstore E., Inc.*, 58 A.3d 1083, 1091 (Me. 2012) (determining that a gap of less than two months established the causal link), *with Capalbo v. Kris-*

*Way Truck Leasing, Inc.*, 821 F. Supp. 2d 397, 417 (D. Me. 2011) (finding seven months too long to create a temporal inference of causation). Federal law construing analogous statutes may guide courts applying the MWPA. *Brady*, 126 A.3d at 1152 n.5. The First Circuit has found three months to be "close enough to suggest causation" in a Title VII case. *Sánchez-Rodríguez v. AT&T Mobility P.R.*, 673 F.3d 1, 15 (1st Cir. 2012); *cf. Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 178 (1st Cir. 2015) (finding two months "sufficiently short" to indicate causation); *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) (holding a gap of six months could not give rise to an inference of causation without corroborating evidence).

Couture alleges several facts relevant to the plausibility of a temporal, causal link between his potentially protected conduct and termination. As discussed above, Couture alleges he refused to conduct illegal or dangerous conduct on October 23, 2014, and AmeriGas terminated his employment on January 22, 2015. Am. Compl. ¶ 25. So, the closest time span between Couture's potentially protected conduct and the adverse employment action is three months. The Defendant argues that this is too much time to suggest causation without additional corroborating evidence. Following the First Circuit in *Sánchez-Rodríguez*, however, a reasonable fact finder could determine that the thirteen weeks in this case is "close enough" to establish a causal link. *See* 673 F.3d at 15.

Furthermore, Couture alleges that he was unusually monitored for driver camera policy infractions and disproportionately punished as compared to other employees who had not been "written up." Am. Compl. ¶¶ 23-26. These allegations

9

bolster Couture's claim of causation. *See Brady*, 126 A.3d at 1153-54 (lack of temporal proximity is not dispositive, and circumstantial evidence may supply necessary causal link); *see also Osher v. Univ. of Maine Syst.*, 703 F. Supp. 2d 51, 68 (D. Me. 2010) (naming differential and disparate treatment as circumstantial evidence of a causal link).

Finally, AmeriGas contends that its November 16, 2014 rehiring of Couture irretrievably broke the chain of causation. Def.'s Reply 6. AmeriGas relies on both *Johnson v. Washington Metropolitan Area Transit Authority*, 355 F. Supp. 2d 304, 305 (D.D.C. 2005) and *Dube v. Middlesex Corp.*, 797 N.E.2d 925 (Mass. App. Ct. 2003). Both cases were decided on summary judgment and are factually distinguishable. Although it is possible that the rehiring of an employee could break the causal link, on a motion to dismiss I view the allegations in the light most favorable to the plaintiff. Here, it is plausible that upper management's directive to rehire Couture was later undermined by a local manager who continued to look for an opportunity to terminate because of the Plaintiff's earlier protected conduct and his complaints to upper management. Accordingly, the Defendant's argument that the Plaintiff has not alleged facts sufficient to establish causation does not carry the day.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to dismiss pursuant to Rule 12(b)(6).

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 3rd day of October, 2016.